The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Before we call the first case, it is with great sadness that I want to acknowledge the passing of our colleague Juan Torrea. He spent many years of excellent service to this country and to this Court. He would want us to proceed with business as usual, and so we will now do that. Clerk, please proceed with the first case. Thank you, Judge. Today's cases will be called as previously announced and times will be as allotted to counsel. The first case today is United States v. Sharon P. Carter, appeal number 191644, and United States v. Gregory Canigliaro, appeal number 191645. Attorney Goldman. Good morning, Your Honors, and may it please the Court, Ross Goldman for the United States. And if I may request four minutes for rebuttal. You may. Thank you, Your Honor. And before I begin, let me just offer my condolences to the Court on the passing of Judge Torrea. In holding that the defendant's convictions for conspiring to defraud FDA were purely legally impossible and were obtained in violation of the defendant's right to fair notice, the District Court misunderstood the theory of this prosecution and overlooked or misinterpreted critical pieces of the historical record in the trial testimony. The defendants were convicted because they participated in an agreement to lie to FDA about a core feature of NECC's business operations, a feature that staff members at all levels of NECC well knew, because FDA had well explained it, lay at the center of how FDA would exercise its enforcement authority over compounders. FDA had repeatedly explained in the two compliance policy guides and in direct communications with NECC that FDA would continue to defer to states to regulate traditional compounders that dispense drugs pursuant to valid patient-specific prescriptions, but that as to those entities that operated more like manufacturers by shipping vast quantities of drugs around the country without accompanying patient-specific prescriptions, FDA would be likely to enforce the full weight of the FDCA against those entities. Counsel, Judge Lopez, I'd like to ask you a question which would be helpful to me and I hope to my colleagues. I gather it's your position that since the adoption of the FDA Act of 1938, compounded drugs were within the terms of that statute, new drugs, and therefore it has been clear since the adoption of that Act that the FDA had the authority to regulate compounded drugs. Is that correct? Is that your position? That is correct, though we don't think our case rises and falls on that point, but we do agree with that, Your Honor, yes. Okay, so you don't think it's important that since the adoption of that Act that you could ground your regulatory authority over compounded drugs in that language of the statute, the definition of new drugs? I do think it's important, Your Honor. I guess the point I would make is I know the defendants, I think, dispute the notion that compounded drugs fit within the statute's definition of new drugs. We think that's wrong, but even putting that to the side, compounded drugs are still manifestly drugs under the FDCA, and as the Supreme Court explained in Western states, the FDCA empowers the FDA to regulate the distribution and manufacture of all drugs, not simply new drugs. So that's one reason why I think the fact that it's the case that FDA's authority over compounded drugs is, I think, sufficient. I guess I would say it's not necessary because of the point about all drugs, but even putting that to the side, and this is respectfully to the district court, one piece of the prosecution I think perhaps the court misunderstood, I think it's better to think of this case as involving FDA's authority over manufacturers and not over compounders because the whole point of the lie here was to tell FDA, we are traditional compounders, so you should be hands-off consistent with your explanation of your enforcement authority, when in fact NECC was operating as a manufacturer and there is no dispute in this case. The district court didn't dispute it. The defendants don't appear disputed that FDA has plenary authority over drug manufacturers. To that point, let me just ask you this. It's a hypothetical, so if it's not clear, tell me, and I'll see if I can make it clear. I just want to zero in on this point for the government's theory. As I understand it, the government is not disputing that there was FDA regulatory guidance  for some new drugs without a prescription to a customer in a quantity that was small enough and consistent with historical practice that that would not attract regulatory attention from the FDA. Is that right? I believe the compliance guide, the 2002 guide, talks about limited quantities of that kind of compounding in anticipation of receiving a prescription if the anticipatory compounding is done by the firms who would expect the prescriptions. That's right. So suppose our facts for this, and this is just for understanding the government's theory. Suppose there was an internal memo from NECC saying, we want to do exactly what that 2002 compliance document says, but I'm a little worried as to whether FDA is going to stick by that. So let's tell them everything we're sending out is to a specific patient with a specific prescription. So we're going to conspire to lie to the FDA to cover up activity that plainly falls within the safe harbor set forth in the FDA compliance document. Would that be a conspiracy to commit fraud or would that be legally impossible? I think it's not our case, but I just want to understand your theory. No, I understand and I appreciate the question, but I think I didn't follow. If they were if they were if the lie was let's tell FDA that we're we're shipping with prescriptions when in fact they were not shipping with prescriptions, then that would place them outside the scope of the. But there is a memo that says what we're actually doing is sending it to a client. In advance of what we expect to be the prescriptions that will come in from them, consistent with our historical practice of meeting only the limited orders that they do. So it's basically that advanced stock or office stock production, which I understand doesn't have to be done with a prescription when the vial goes out. So so this is a technical point, and I know it's not at the heart of your question. I think there's. Thank you. I think there's a difference between in this context, between anticipatory compounding, which is compounding in advance of a prescription and then office stock, which is just providing doctors offices with a supply of drugs that they can keep on their shelf to use when they need it. OK. So they're both are permitted under the guidance. Correct. No. Office stock was something that FDA never, never recognized. Anticipate. I'm sorry. Anticipatory dispensing was very limited quantities. That's right. And so to answer. Yeah, exactly. Take my hypothetical. Imagine it's anticipatory dispensing of the type that fits within the regulatory guidance. But they tell FDA not that we're doing anticipatory dispensing, but that we're only sending it out to an actual client, actual patient with an actual prescription, which is not true. Yes. No, I think that would fall under three, three, 71 conspiracy to fraud. It would not be purely legally impossible because if FDA, for example, were to think that everything is done on a per prescription basis, then they would be likely under the 2002 compliance policy guide to defer to the states to regulate. If what the entity is doing is doing some amount of this anticipatory compounding. Well, that's something that it is at least reasonable to assume under the compliance policy guide that FDA would have at very least wanted to take a closer look at to make sure that the scope and amount of that anticipatory compounding is not such that it brings a compounder sort of over the line to a manufacturer. OK. So tell me how we could decide this case on a basis that would not commit us to agreeing to your position with respect to my hypothetical. What is different about this case than my hypothetical? Because in this case, they were not in your hypothetical, as I understand it, they are in fact operating within the confines of the 2002 compliance policy guide. This case, they were manifestly operating outside the contours of that policy by shipping massive amounts of drugs around the country without without valid patient specific prescriptions. Purposes of that question, whether they were, as you say, acting outside the safe harbor. Is that a factual question for the jury for which all there needs to be a sufficient evidence to make that conclusion? Or is that a legal judgment as to whether they were within the safe harbor or not? I think that would be a factual determination. I mean, this evidence was put before the jury. And I think this is surely the kind of evidence that a jury would be able to to evaluate against the standard here. I do want to make a couple of other points relevant, I think, directly to your honor's questions here. And it does it does return us to this case again. We lost principally on the theory that it was purely legally impossible for this for this conspiracy to have actually defrauded FDA. And I really think it's critical that the court bear in mind, because this is evidence that this court overlooked, not only was the conspiracy possible, it was actually successful. And just as a matter of logic, a person cannot succeed at a thing that is not possible. And there's in particular two pieces of evidence I would point the court toward. One is at page thirty one hundred of the joint appendix where Dr. Janet Woodcock, the head of the Cedar at FDA, testified that if we quote, if we had found out this misrepresentation, we would have taken action. So there's Dr. Woodcock saying, had we known the truth, we would have acted. Similarly, on page twenty nine, 13 of the joint appendix, Samia Nasser testified. And Samia Nasser is the former head of FDA's compounding team. And she testified that, yes, there was this temporary hold on inspections of on routine inspections of pharmacies in 2008, 2009 timeframe. But Samia Nasser says, had we known the truth, we would walk in and do the inspection based on the GMP. That's the good manufacturing manufacturing practice right away. So there's two pieces of evidence show, I think, beyond any measure. Can I ask you about that? One point that I was confused by in the brief, if I understand that the jury instructions suggested that the jury was supposed to find that the FDA would have taken action in your briefing, you at point say that. But at other points, you say the FDA would seriously have considered acting. What is the difference between those two and how do I square the second theory with the jury instructions, which don't seem to have that qualifier? So the seriously consider language comes directly from the 2002 compliance policy guide. When the when FDA is explaining how it exercise its enforcement authority over over those entities that are operating. I thought the jury instructions with the FDA would take action. So I think at one point in the jury instructions, the court says that we have a footnote on this point in our brief. We think that instruction is wrong, precisely because if I may finish. Yes, you may. Thank you. We think that instruction is wrong because it butts against and is inconsistent with the well-established principle of conspiracy law. What are we supposed to do on appeal, though? I mean, you can't. It was given and that's what the jury was under orders to find. Well, for purposes of sufficiency review, and I think the Supreme Court's decision in Musaki a couple of years ago makes this point very clear that you just measure sufficiency against the actual elements of the offense. And if there's any problem or any difference between the jury instructions and the elements, sufficiency is measured against the elements of the offense. And what I think the most salient point here, and again, I'm in over time, so I'll make this my last thought unless there are further questions, is the conspiracy was successful. And by definition, if it was successful, it had to have been legally possible. I'm happy to field more questions, but otherwise, well, I'll just wait for rebuttal. Thank you. We'll hear from your opponent. I believe it's going to be Attorney Rabinowitz, Judge. Fine. Good morning. May it please the court, Dan Rabinowitz on behalf of the Pele, Gregory Canigliaro. I would like to start off by reminding the court what the heart of the indictment was against my client, the only charge brought against him, which was that he conspired to defraud the FDA concerning a governmental function. And at the heart of the legal impossibility decision issued by Judge Stearns was a finding that, in fact, there was no governmental function to actually defraud. And that is the legal impossibility part of this case at the heart of it. Excuse me, Judge Stearns acknowledged that in extending this doctrine of legal impossibility to a decision by an administrative agency to discretionary decision to not carry out a function that they were authorized to do. That was a legally unprecedented ruling. He seemed to acknowledge that he could not find any case that supported that view of legal impossibility. Was Judge Stearns right when he said that? Well, I think he was, but that doesn't mean that this is not an absolute case of legal impossibility, Your Honor. I mean, the fact of the matter is that there was no function and the FDA abdicated their authority. And the evidence at trial was clear on that, that all of the various different congressional testimony that we brought out, all of Dr. Woodcock's testimony showed that, that the whole concept of a manufacturer and a compounding pharmacy, that the distinction was not black and white. And trying to figure that out, in the words of Dr. Hamburg, was trying to put a square peg into a round hole. And so, while there may not be another case that could be cited to for that concept of an administrative agency, as the facts were applied to the law here, the object of the conspiracy was surely legally impossible to achieve. Counsel, your opponent just cited the testimony of two different regulatory authorities, each of whom said, had we not been lied to by the compounding pharmacy, then we would have certainly taken action. So that, as a factual matter, precludes the theory you're adopting. How can we ignore the fact that the jury accepted that testimony? Respectfully, Your Honor, those two pieces of evidence that were cited were against a backdrop of a sea of other evidence that was completely contradictory to those two pieces. So how does legal impossibility turn on a dispute over the meaning of evidence where the jury accepts one view and not the other? I would have thought that was a sufficiency challenge on your part. Your Honor, those facts support my argument that legal impossibility was what was going on here. And I would suggest that Judge Stearns was the best person to judge whether those two little tiny pieces of evidence against the backdrop of the sea of other evidence was credible or not. He did not find insufficient evidence. He found legal impossibility. You have switched the grounds of your argument. Respectfully, I'm not, Your Honor. I want to make sure that this is clear. My argument is not sufficiency of factual evidence. My argument is that, as Judge Stearns articulated in his well-thought-out decision, that the object of the conspiracy was purely legally impossible. And that's because the FDA had stopped trying to draw the distinction of a manufacturer and a compounder. And despite that testimony, that doesn't mean that the law changes. And he found that that was the state of the law at that time. I understand the argument, and I think that is a good summary of the position. Here's the difficulty with it. If the 92 or 2002 compliance guidance from FDA had said it is too difficult for us to figure out the difference between a compounder and a manufacturer, and so we are not going to go after compounders, your case would obviously be much stronger. But in fact, the 92 and 2002 compliance don't say that. They say there's a series of safe harbors that compounding pharmacies can fall within that will protect them against being regulated as manufacturers. So the difficulty I have is, well, what if the evidence here would permit a jury to conclude that NECC was engaged in conduct that didn't fit within those safe harbors? By definition, there wouldn't have been a lack of notice to NEC that if you're outside the safe harbor, you're at risk of being regulated. Well, first of all, your honor, this is strictly a legal argument that I would suggest was left up to the court and not the jury. This was not the question of what activity they would get. You're right about the structure of the argument. It's a legal question whether or not FDA had, by giving this notice, precluded themselves from turning around and switching. But since the notice they gave denominated non-exclusive safe harbors. I don't see how you could read the 92 or 2002 regulatory guidance to preclude FDA from ever going after anybody who is named a compounder as a manufacturer. So that seems to me the factual question becomes, could a jury have found that what the NECC thought it was covering up was activity that fell outside the safe harbor? Because if so, what would preclude the FDA from going after them? Well, first of all, you also have to consider the years and years of inaction that occurred after those compliance guides were published. And that's extremely relevant, too. And the testimony of Samia Nasser, that there was a moratorium on inspections for years and years. And all of the inspections that actually did take place with the FDA was inside NECC. All of that was factored in by Judge Stearns. And I will also say one other thing, Your Honor, that I wanted to comment quickly on the way the government characterizes the Colorado scenario that's laid out in our brief. Here you have a situation where 2011, Colorado writes to the FDA and says, we found NECC's medicine in our clinics and we don't show them as a manufacturer, do you? The FDA waits a year to write back. And when they do, they say, you should contact Massachusetts. And the government says in their response, oh, well, that's proof that even Colorado thought the FDA had jurisdiction. And that's just absurd, respectfully, to the government. That shows everybody. Question for you, and I think I know how you're going to answer this, but what is the relevance to the legal impossibility theory? The relevance of the acute awareness of your client that they operate within the safe harbor of those policies in, I guess, 2002 and the earlier policy. What I mean by that is they understood that it was critical that they were able to document that the drugs that they were supplying were in response to specific prescriptions. They seem to be fully aware of the proposition that if they could not document that they were responding to specific prescriptions, they ran the risk of being treated as a manufacturer. So their own conduct suggests a heightened sensitivity to the very distinction between manufacturers and compounders that the FDA was describing in those policy guides. The record seems to amply support that proposition, does it not? I'm going to answer your question, Your Honor, but I wanted to note that my time is up and Mr. Pino is about to take over the argument. No, you will answer Judge Lopez's question and then we will turn it over. Yes, Your Honor. I was intending to do that. I just wanted to note that Mr. Pino was about to pick up the ball. But the answer to your question, Your Honor, is that the evidence was that NECC shipped to many states that allowed offices to obtain the medication before patients came in. And many times they did that without patient names and there were lots of centers that it was the customer who wanted to use the fake patient names. It wasn't NECC putting in fake patient names. It was the customers who said, we're going to use these fake patient names. And it's not a great fact that NECC accepted those names, but the evidence wasn't that NECC was the entity that was putting in the fake patient names. It was the customer that was supplying those. And there wasn't evidence that NECC was saying, hey, use fake patient names. That wasn't the evidence in the case. And so I understand the question is designed to drill down on that issue. But that was not the case. NECC did not think that they needed patient names when they were shipping to a business that was in a state that allowed office use. And let's not also forget that there were 144 contracts that came into evidence where NECC had papered the relationship with hospitals all across the country that they were in a shared services arrangement that said that they didn't have names. Before you sit down, I know your colleague is going to present to us, but are you denying that NECC and we can put aside for a second whether your particular client can be associated with this, but are you denying that the NECC made false statements about their practices regarding the means of their dispensing of these with or without a prescription to the FDA? I'm not denying that generally, Your Honor, but during the term of the indictment and my and my client's knowledge and my client's actual statements that I do deny. Yes. Putting that aside, though, for purposes of the legal possibility argument, this is just as your answer to Judge Lopez. I thought it was a premise of the legal possibility argument that there were false statements made to the FDA. And so the only question is, given that they were covering up something, what was it that they were covering up? But I would answer that respectfully, Your Honor, with with the following point. The whole point of the legal impossibility argument and the whole point of legal possibility finding was that if the object of the conspiracy is legally impossible, then it doesn't matter what the false statements were. But Judge Lopez's question to you is they seem to think it was important to cover up that they were sending them without prescriptions, which suggests they understood them to be a potential regulatory risk in consequence of doing what they were doing. Now, either you're saying they were mistaken because that risk was no risk at all, or you're saying they didn't think there was any risk. And so what they were saying wasn't false. I just don't. Those two are very different positions. Well, I and my again, I hope that you give my co-counsel a little extra time because I don't want to take up his time. And we're continuing past my. He will have his normal time. Are there any further questions of this attorney? I don't know. Did you want to answer my last question or not? Well, I wanted to say that that again, the risk. There's no evidence that the NECC thought that there was a risk that the FDA would do anything about it. May perhaps there was a risk about state regulators who might care about it. But under Tanner, the target has got to be the FDA and the evidence on the federal target is extremely, extremely thin. I would say not there. I know that's a sufficiency of the evidence argument. But when you're thinking about the object of the conspiracy being legally impossible, I believe that that's relevant. And I thank the court for allowing me a little extra time. And I apologize to Mr. Pino for going over a little bit. Thank you. At this time, we would like to hear from Mr. Pino. Good morning, your honors. My name is Michael Pino and I represent Sharon Carter. I would like to to pivot slightly and focus on due process. And my jumping off point is going to be the following proposition, which is that claiming to have authority is not the same as actually performing a function. And that distinction matters for two reasons, both rooted in due process. The first is the government's decision here to charge a conspiracy under the defraud clause of 18 U.S.C. 371. And this court noted in U.S.V. Goldberg that that conspiracy clause has a special capacity for abuse because of the vagueness of the concept of interfering with a proper government function. Now, we've cited in Ms. Carter's brief, the Supreme Court's holding in cases like Skilling and McDonald, where the Supreme Court addressed similarly indeterminate statutes and suggested that to satisfy due process principles, the government must at minimum base charges on on things that are clear and specific violations here. Applying those principles suggests that a client conspiracy charge needs to be predicated on clear, specific government functions rather than amorphous or more amorphous claims to have the authority to perform a function. The second issue is that the government's decision to second due process issue is that the government's decision to rely on a regulatory framework that the FDA itself knew was unclear, but that it failed with Congress to take action to clarify. And for that, I think it's important to look to this circuit's decision in U.S.V. Anzalone, where the court reversed on due process grounds convictions for allegedly committing currency transaction reporting violations that were based on a prosecutor's legal argument regarding a regulation that the Treasury Department had known was unclear and it failed to clarify. That same reasoning led to the same conclusion in the Ninth Circuit's decision in U.S.V. Anzalone. Why does this sort of internal debate within an agency, professions of concern about legal authority, perhaps based upon court rulings that have been made, why does that internal debate matter at all if the external signals as to the agency's understanding of its authority is clear? And for those external signals, I'm referring to the compliance guides that Judge Barron was referring to earlier. I mean, those compliance guides seem very clear as to how the agency viewed the distinction between manufacturers and compounders. It provided safe harbors for the compounders if they did not want to be treated as manufacturers. So there may have been this internal debate going on, but the external signals, I suggest, were quite clear. So why does this internal debate matter at all? So for two reasons, Your Honor. The first is that internal debate in the five minutes remaining. The frank, explicit acknowledgement by the FDA, first internally and then subsequent to the meningitis outbreak, that internal debate manifested itself in an external decision not to perform the function. So what that means is that the policy guides that the FDA issued, frankly, the testimony that was cited earlier that was given at trial, those amount to protestations that we had the authority. It's a claim to have authority. It's not the actual performance of the function. And so because of their internal uncertainty, which they later acknowledged quite explicitly, the FDA made the decision to stand down. And you can see that play out in the acknowledgement on their part that they declared a four-year moratorium that precluded their staff from going out and conducting oversight inspections of compounding pharmacies. Doesn't that make the fraud all the worse? I would say no, Your Honor. But just on that point, I mean, the thought would be that what they decided to do was rely on the representations. So the representations are false. That makes it quite problematic. Just to test the proposition about your position, suppose an internal actor at NECC writes to the FDA and said, I just want you to know there's no representations have yet been made by NECC. There's no lies or anything. But an internal actor at NECC writes to the FDA and says, I just want you to know they're sending out 10,000 vials a week of medications with no prescription and no prospect of a prescription. Could the FDA have regulated the NECC in response to that information? I think the FDA absolutely would have said they could. And I think the industry would have contested it. Would you say due process would have precluded them from regulating in that circumstance? Perhaps, Your Honor. You can't have perhaps. You have to have. I will give you an unequivocal yes. And the reason being that the FDA had failed to set out clear boundary lines defining where its authority is and where it ended. Is there a way for you to win on the legal impossibility argument as to fraud in which the answer could be that the FDA would be able to regulate in that circumstance? Or are you really just saying they had disclaimed all ability to do process for closes the FDA from regulating anybody who I guess what represents that there are compounders suggest they might be a compounder because all manufacturers should go change their names if that's the position. And I appreciate that question. I guess my response is that the FDA's own witnesses testified at trial and before Congress that they were well aware that the so-called outsourcing compounders had come into existence. And they knew exactly the nature of the work that they performed. And yet they stood down and made an intentional conscious decision not to perform the function of exercising oversight over those compounders because they believed their authority to do so was unclear. And so even though they were not going to admit to the outer world that they internally question their own authority. If I was hesitant in the course of adopting your position to write an opinion that would preclude the FDA from regulating effectively anybody who wants to pass themselves off as a compounder but is in fact engaged in manufacturing at a broad scale. In clear violation of the policy guidance from the FDA in 92 and 2002. Is there any way you could help me so that you could win on a narrower ground than that? Because that position is asking quite a lot I think of the court that we can only affirm your position if the consequences that all manufacturing essentially can go unregulated as long as it passes itself off as compound. Your Honor, I think the narrower ground would be a recognition that the evidence pretty much undisputed was that NECC fell into the category of an outsourcing compounder. They were not Merck. They were not Pfizer. They were not Sanofi. They were an outsourcing compounder. And like many outsourcing compounders, they blurred the line. They were not a mom and pop on the corner of Main Street. They were an outsourcing compounder filling a gap created largely by hospitals' decisions not to compound themselves in-house. And that's I think the narrower path for the court. It seems to me even if a line between the manufacturer and compounder was somewhat murky, it seems to me the evidence suggests that your client by representations it made as to how it conducted its business, representations it made to the FDA, the way in which it tried to document responses to prescriptions that were false, it was taking extra steps to make sure it fell on one side of that line, however murky it was, because of the fear that absent that documentation, the FDA would take the position that you're on the other side of the line, that you're a manufacturer. So I don't see how even the acknowledged sort of uncertainty of the line helps you when it's so clear that your client was taking steps to stay on one side of that line, whatever its ambiguity. And I guess I would revert, there are two points I want to make. One is that as a matter of law, the function that the government is going to claim, claims there was a conspiracy to impede has to be clear and specific and it was not here. And I'd like to take that question though and pivot quite briefly to the insufficiency of the evidence arguments that my client has made, because in your question, Your Honor, you talked about my client having known, and my client having participated, and there absolutely was no evidence that Ms. Carter had any knowledge, much less any involvement in anything having to do with regulatory matters or regulatory communications. That's time. Now, just quickly. Counsel, your time is up. You have argued this in your brief. I will ask my colleagues if they have any questions on this point. I wouldn't mind you just finishing your answer to judge the peasant on that as to why you think Ms. Carter doesn't have the culpability, even if other actors in AC might. Because, Your Honor, of the complete absence of any evidence that she did anything more than work in the order processing department. She had absolutely no involvement in any regulatory matters, and I would urge the court to look at the decisions we cited, particularly Papathanasi and Atkinson, and compare those cases, both involving client conspiracies, both involving grants of acquittal. Compare those cases to the decisions the government cited in its reply brief, in particular Mubaid and U.S. v. Apollon, and you can see quite clearly there that the volume of evidence the court deemed sufficient in Mubaid and Apollon simply are not present here. This case is very much as to Ms. Carter like Papathanasi and Atkinson. Thank you. Thank you. We'll hear the government has reserved four minutes, I believe. Yes, Your Honor. Thank you. Just a couple of points. First, I want to start with a dialogue that Judge Barron and I had with respect to the jury instructions. The jury instructions are on page, the relevant instructions on page 211 of District Court docket number 1929. And the court there actually says that the government is not required to prove that the alleged conspiracy actually succeeded in deceiving the FDA. And then goes on to explain what we must prove, that there was an agreement, that the defendant joined it, and that there was an overt act. The idea here that we were required to prove that FDA would have actually done something comes from the Rule 29 order and not from the jury instructions themselves. So that's, I just wanted to clean that up. I had a chance. Was the jury not instructed to find that the FDA would have acted? The jury was instructed to find that a conspiracy to defraud FDA actually existed, that the defendant was a knowing and willful participant, and that any misleading misstatements were material in the sense that they had the capacity to cause the FDA to act differently. Was the jury instructed at any point that they had to find that the FDA would have acted? I do not believe so, no. The District Court made a reference to that in its Rule 29 order. But as I'm looking at the jury instructions here, and again, it's at page 211 to 212, I don't see that requirement. And that would make sense, given traditional principles of conspiracy law. A couple of other points I just want to respond to. The idea here that FDA had relinquished its authority in this area is, I think, belied not only by the compliance guides and by the communications to NECC, but the fact that FDA actually regulated NECC by inspecting them in 2002, 3, 4, and 5, by issuing the warning letter in 2006, and post-outbreak by exercising the same pre-outbreak authorities to investigate pharmacies, by exercising that over roughly 60 pharmacies in the period shortly after FDA learned of the outbreak. That's consistent with Dr. Hamburg and Dr. Woodcock's testimony before Congress, that although the industry contested various aspects of FDA's authority, both witnesses repeatedly testified that FDA had authority all along over compounders under the FDCA. So this idea here that there was a relinquishment of authority is just, I think, belied by the record. And I think one other point I want to make here, and then I'll pivot to Ms. Carter's sufficiency claim, is that a compounder is not a compounder just because they say they're a compounder. A compounder is a compounder if they do compounding work. NECC said they were a compounder, but they acted like a manufacturer. They knew all of this. They knew the regulatory rules of the road. It's why their scheme, why the lie, was so perfectly calibrated to fit the way FDA announced it was going to explain its enforcement authority and its compliance policy guides. Counsel, excuse me. How did the agency explain that four-year moratorium? The suggestion is that in that instance, there was a public acknowledgment of legal uncertainty about their authority to exercise regulatory control over compounders. Is that correct? I don't believe that there was – there was certainly a public recognition of the hold after the fact in the congressional testimony after the outbreak. I don't recall the evidence being that there was a contemporaneous announcement from FDA saying we're going to put all these inspections on pause. But I do – but I also want to make the point that the temporary hold here was much narrower than what the defendants suggest. It was a temporary hold on routine inspections of true compounders. It did not apply to for-cause inspections of compounders. That's at Supplemental Joint Appendix, page 683. It was not a decision to stop regulating compounders and pharmacies altogether. That's at Supplemental Joint Appendix 453. What do you mean by for-cause inspections? So a report of an adverse event, someone getting sick, for example, from a compounded truck, as opposed to a schedule where we're just going to pop in. I know my time is up. That doesn't – that doesn't suggest that, well, they're really acting as manufacturers. I mean, an adverse event could be because in doing their compounding work, they put out a bad product. I mean, that doesn't – For sure, that's right. For sure, I agree with you on that entirely, Your Honor. My point is only the defendants would have this temporary hold be the equivalent of FDA making a public pronouncement. As long as you say you're a compounder, we can't touch you. And I think the reality of the record shows that that is actually a much narrower hold and that FDA had maintained its authority to go even into real compounders for for-cause inspections during this period. And certainly it's the case that FDA never pressed pause on its authority to inspect entities that were in fact operating as manufacturers. Well, now I'm – I thought that the theory that you were pressing was that the – what they were covering up was that they were acting as manufacturers. Is the answer you were just giving to Judge Lopez a way of saying that they were impeded in their ability to go after them as manufacturers? No. No, no. FDA was never – never thought – no, absolutely not. Correctly, that it had plenary authority to go after manufacturers. No, but I'm saying – I know that. But in your answer to Judge Lopez, the thing you identified that they could do despite the moratorium was to go after them if there was an adverse event. In doing that, would they be treating the person as a manufacturer? The adverse event piece is independent from whether – the issue of whether they're a manufacturer piece. The relevance of it to the conspiracy charge you're trying to prove. I don't understand that. The relevance of the hold? Mr. Goldman, I believe you gave a separate answer that there was never any hold on FDA authority over manufacturers. It is true that when you replied to Judge Lopez, you used the for cause, but isn't your stronger point that there was never any hold as to manufacturers? That's fair. But I thought, just so I get this point, the narrower argument that Mr. Pino just presented to us was that there was a category of compounding that did not involve direct prescription-based individual dispensing. And that there was a hold with respect to people in a moratorium on going after compounders who fell into that broader category. So the thrust I thought of Judge Lopez's question is given that moratorium is to that category of compounders, if the evidence suggests that NEC was a compounder of that type, wouldn't that support the legal impossibility argument? What's the answer? The answer to that is it's simply inconsistent with the record to think of this as there being three categories of entities. A traditional compounder, a sort of outsourcer, a big compounder, or a manufacturer. At the time of the conspiracy here, and Dr. Woodcock testified to this very clearly, you could be either of two things. You could be a compounder in which you dispense pursuant to patient-specific prescriptions. Or if you shipped without those prescriptions, you were a manufacturer. There were two buckets. The idea of an outsourcing compounder is something that came through the 2013 legislation that statutorily created a third kind of entity. But at the relevant time, you were either a compounder or you were a manufacturer. I guess the only point I want to make with respect to the hold, and I think it's the most relevant point, is whatever you think about the hold, the hold manifestly did not apply to entities that FDA thought was operating as a manufacturer. The reason that's relevant to the pure legal impossibility point is, again, the lie here is FDA were a compounder, but secretly were operating as a manufacturer. Had FDA known the truth, that is, had FDA known that NECC was operating as a manufacturer, this whole business of the hold— Last question. If I thought there was a basis for thinking that FDA might have faced a due process constraint in going after an outsourcing compounder, I know you say that we shouldn't think that, but I'm just saying, if one were to agree with that proposition, is there evidence in the record from which the jury could have found they would not even have clearly qualified as an outsourcing compounder? And was the jury instructed in a way that would have permitted them to make that finding and think that that was a relevant finding for purposes of the conspiracy charge? No, I don't recall there being an instruction at that point, and I think your question is hard to answer because I don't know that there's a settled definition of what even it means to be an outsourcing compounder in this case. But even taking your Honor's premise that there was such a thing as being an outsourcing compounder at the time, and further, that that's what NECC was doing, maybe those things would be relevant if this case was about FDA trying to enforce a substantive regulation on NECC. But that's not this case. This case is only about one thing. It's only about an effort by NECC, by the defendants and their co-conspirators, to lie to FDA for the purpose of interfering with FDA's authority, and they knew precisely the relevant lie to make. The lie to make was we are dispensing to prescriptions when we're not. I know I'm very over time. I've not had a chance to respond to Ms. Carter's back intensive. Please take a minute to respond to the sufficiency of the evidence as to Ms. Carter. Thank you, Your Honor. I'll do so briefly. Ms. Carter, far from being someone who only worked in order processing down in the lab, had her hands in every aspect of the business. She trained employees. She interviewed job applicants. She was the lead pharmacy tech. She was the operations manager. She was viewed by multiple people at NECC as holding a position of supervisory authority and control. The second point is that she had a very close working relationship with Barry Cadden, the mastermind of the whole conspiracy. And one piece of evidence that I think is highly relevant to showing Ms. Carter's involvement in the conspiracy is the email from Barry Cadden to Ms. Carter in which he says, among other things, all of our patient names must, quote, resemble real names. No obviously fake names. He's not saying we have to have real names. He's saying the names have to resemble real names. And Ms. Carter, far from showing surprise or pushing back, simply forwards that email to a distribution list and says in that email to the distribution list, if you get orders that don't have sufficient patient names, let Barry Cadden know and he'll decide how to proceed. So that's another relevant point here. Another point is that this is a sophisticated, highly regulated business in a highly regulated industry. And drawing on this court's opinion in the Southern Union case, it is fairly presumed by a jury that senior officials in a company like this know the regulatory rules of the road. And I think the evidence is overwhelming in this case that Ms. Carter did. The other point I want to make on sufficiency is it's not like this non-patient specific practice was a small piece of their business. This had become NECC's business model. Staff all up and down the hierarchical chain at NECC knew that they were shipping without patient specific prescriptions and that that would lead them to be treated as a manufacturer had FDA known the truth. And so you put all of this together and you ask the question, could any reasonable jury have concluded on this evidence that Ms. Carter knowingly joined the conspiracy on that standard, which is a much more of a traditional sufficiency question? I think that a rational jury could readily have concluded concluded that. And so I know I'm over time. I'm happy to rest the rest of that argument on our briefs or answer any further questions of the court, of course. I just want to note in the jury instruction, it says Barry Cadden, Mr. Canigliaro, Ms. Carter, Mr. Panitz, and Mr. Ronzio conspired to impede the ability of the FDA to perform its governmental functions by attempting to deceive it through false or misleading statements about the true nature of NECC's business in order to obstruct the FDA in carrying out the regulatory oversight it otherwise would have exercised over NECC. So that's the part that was concerning me. That's not that it seriously would have considered exercising. It's that it says in the instruction would have exercised over NECC. Yes, I read that instruction to be saying that the conspiracy, if successful, would have resulted in impeding FDA, not that the government would have had to prove that the conspiracy did, in fact, impede FDA. And I think that's the only right way to read it, because if the court reads that instruction to say that in a conspiracy case, the government has to prove that the object of the conspiracy was satisfied in the conspiracy. So that's obviously not the law. And I don't read the instruction to be that way. Thank you. If there are no further questions, we would ask the court to reverse the Rule 29. Thank you, counsel. Thank you, Your Honor. We'll take it. That concludes the argument in this case. Attorneys Goldman, Pino, and Rabinowitz, you should disconnect from the hearing at this time.